# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

Nº 10-CV-2603 (JFB) (ETB)

---

PATRICIA WEISS,

Plaintiff,

VERSUS

INCORPORATED VILLAGE OF SAG HARBOR, ET AL.,

Defendants.

---

MEMORANDUM AND ORDER
January 24, 2011

---

JOSEPH F. BIANCO, District Judge:

Plaintiff Patricia Weiss ("plaintiff" or "Weiss") commenced this action on June 8, 2010, against defendants Incorporated Village of Sag Harbor ("Village" or "Sag Harbor"), Sag Harbor Village Board of Trustees ("Board of Trustees"), Mayor Brian Gilbride ("Gilbride"), Trustee Edward J. Gregory, Trustee Robby Stein, Trustee Timothy Culver, Trustee Tiffany Scarlato ("Scarlato") and Does 1-5 (collectively, "defendants"), alleging various violations of her constitutional rights pursuant to 42 U.S.C. § 1983. Specifically, the gravamen of plaintiff's complaint is that defendants have violated her rights by allowing non-lawyers to serve as justices, with the power to incarcerate individuals appearing before them, in the newly-created Sag Harbor Village Justice Court. Plaintiff also contends that her rights have been violated through a number of defendants' actions that were incidental to the creation of the Village Justice Court. Plaintiff seeks both injunctive and declaratory relief against defendants. Defendants have moved to dismiss plaintiff's complaint on the grounds that she lacks standing to bring the action, that her claims are not ripe for adjudication, and for failure to state a claim. For the reasons set forth herein, the Court grants defendants' motion to dismiss the complaint in its entirety as it relates to plaintiff's federal claims. Moreover, to the extent that plaintiff's complaint seeks to assert state-law claims, the Court declines in its discretion to exercise supplemental jurisdiction over such claims, given that none of the federal claims survive a motion to dismiss. Thus, the Court also dismisses plaintiff's state-law claims (without

prejudice to re-filing such claims in state court).

I. BACKGROUND

A. Facts[1]

Plaintiff Patricia Weiss is an attorney who resides in the Village of Sag Harbor, located in Suffolk County, New York. (Compl. ¶ 1.) According to the complaint, in or about 2005, the Village began taking steps to establish a Justice Court for Sag Harbor. (*Id.* ¶¶ 17-20.) Specifically, in May 2005, defendants Gilbride and Scarlato, both members of the Sag Harbor Board of Trustees, circulated a nominating petition that, *inter alia*, included the name for a judicial candidate, Roger Walker, who was not a lawyer. (*Id.* ¶ 20.) In addition, in December 2005, the Village entered into a $50,000 contract with a company that would "'coordinate and provide [various enumerated] products and services to establish, organize and implement a Justice Court for [the] Village of Sag Harbor and to integrate the Judiciary Branch into the Village and Village Government.'" (*Id.* ¶ 17.) However, because the nominating petition was circulated before the Village passed any resolution creating the office of Village Justice (*id.* ¶ 19), plaintiff brought an Article 78 petition challenging the Village's actions. (*Id.* ¶ 21.) In June 2006, prior to the general election, a Suffolk County Supreme Court Justice "effectively cancelled the election for Village Justice," after concluding that "'the office of village justice for the Village of Sag Harbor was never 'established' as contemplated by Village Law § 3-301(2)(a).'" (*Id.*)

Subsequently, on June 27, 2006, the Village held a special meeting and passed a resolution that, *inter alia*, approved the creation of the Office of Village Justice. (*Id.* ¶ 22.) At that time, the Board of Trustees "stated an intention to operate out of the [Village] Municipal Building," but, according to the complaint, did not obtain an appropriate Environmental Assessment Form, as required by the New York State Environmental Quality Review Act ("SEQRA"). (*Id.*) Plaintiff attempted to collect a sufficient number of voter signatures in order to petition for a public vote but was hampered from doing so by a Village law that "prohibited Plaintiff from leaving any 'unsolicited print material' on the doorstep of any resident of the Village." (*Id.* ¶ 23.) After the Village amended the law to make it a misdemeanor to leave any such unsolicited written documents on a home's doorstep, plaintiff brought a second Article 78 action in October 2006, this time challenging the Village's "unconstitutional interference with Plaintiff's ability to collect signatures for a referendum." (*Id.* ¶¶ 25-26.) However, plaintiff's action was ultimately dismissed as moot after the Village informed the state court that it had "abandoned the idea of a Village Justice Court and would not be pursuing it." (*Id.* ¶ 26.)

Several years later, in October 2009, the Board of Trustees revisited the idea of creating a Village Justice Court. (*Id.* ¶ 27.) The Village prepared a proposed resolution to create the office of Village Justice and scheduled a public hearing on the matter for February 6, 2010. (*Id.* ¶ 30.) At the hearing, which carried over to a second day on March 9, 2010 (*id.*), defendant Gilbride explained what he envisioned the responsibilities of the Justice Court would be and where the Court would be housed.

---

[1] The following facts are taken from the complaint and are not findings of fact by the Court. Instead, the Court will assume the facts in the complaint to be true and, for purposes of the pending 12(b)(6) motion to dismiss, will construe them in a light most favorable to plaintiff, the non-moving party.

2

(*Id.* ¶¶ 33-42.) In particular, Gilbride noted that the Justice Court would handle "lower level" tickets and offenses, rather than felonies, and would operate on a part-time basis. (*Id.* ¶¶ 38-41.) Additionally, he explained that the courtroom would be located at the Village Municipal Building in the same meeting room used by all of the Village Boards, with the Mayor's office available to the Justices and the Trustee's room available to the court clerk. (*Id.* ¶¶ 33-34.) Defendant Culver also added that no physical alterations were needed to the room or the building in order to begin the operation of the court. (*Id.* ¶ 35.)

On May 11, 2010, the Board of Trustees passed the resolution authorizing the enactment of Local Law #5 and creating the offices of Village Justice and Acting Village Justice. (*Id.* ¶¶ 49, 51.) At the time the complaint was filed, no Village Justices had yet been elected or appointed and the Justice Court had not begun operations.[2]

B. Procedural History

Plaintiff filed her complaint in this action on June 8, 2010. On September 13, 2010, defendants moved to dismiss the complaint. Plaintiff filed her opposition to defendants' motion on October 11, 2010, and defendants filed their reply on October 25, 2010. The Court heard oral argument on December 20, 2010. This motion is fully submitted, and the Court has considered all of the submissions and arguments of the parties.

---

[2] The parties stipulated at oral argument that, during the pendency of this action, Sag Harbor has appointed a Village Justice who is, in fact, an attorney. The parties also stipulated that the election for the Village Justice position currently is scheduled for June 2011.

II. STANDARD OF REVIEW

Defendants have moved to dismiss the complaint under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In reviewing a motion to dismiss under Rule 12(b)(1), the court "must accept as true all material factual allegations in the complaint, but we are not to draw inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004) (citation omitted). Moreover, the court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but we may not rely on conclusory or hearsay statements contained in the affidavits." *Id.* (citations omitted). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court recently clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth a two-pronged approach for courts deciding a motion to dismiss. --- U.S. ----, 129 S. Ct. 1937 (2009). The Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 129 S. Ct. at 1950. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (quoting and citing *Twombly*, 550 U.S. at 556 (internal citations omitted)).

The Court notes that, in adjudicating this motion, it is entitled to consider: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part and vacated in part on other grounds sub nom.*, *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25 (2d Cir. 2005), *vacated on other grounds*, 547 U.S. 71 (2006); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[T]he district court . . . could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim."); *Brodeur v. City of N.Y.*, No. 04 Civ. 1859, 2005 U.S. Dist. LEXIS 10865, at *9-10 (E.D.N.Y. May 13, 2005) (stating court could consider documents within the public domain on a Rule 12(b)(6) motion to dismiss).

"A court presented with a motion to dismiss under both Fed.R.Civ.P. 12(b)(1) and 12(b)(6) must decide the 'jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction.'" *Coveal v. Consumer Home Mortgage, Inc.*, No. 04-CV-4755 (ILG), 2005 U.S. Dist. LEXIS 25346, at *7 (E.D.N.Y. Oct. 21, 2005) (quoting *Magee v. Nassau Cnty. Med. Ctr.*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998)); *see also Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (noting that a motion to dismiss for failure to state a claim may be decided only after finding subject matter jurisdiction).

### III. DISCUSSION

Plaintiff has asserted five claims against defendants. In Count One, plaintiff alleges that her First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights have been

4

violated by the establishment of the Village Justice and Acting Village Justice positions insofar as those offices may be filled by non-lawyers who, despite their lack of legal training, will be authorized to incarcerate individuals appearing before them. (*See* Compl. ¶¶ 50-99.) In Count Two, plaintiff claims that she has been deprived of the right to vote and elect a Village Justice, in violation of her due process and First Amendment rights, because defendants have threatened to appoint, rather than elect, individuals to the Village Justice positions. (*Id.* ¶¶ 100-16.) Plaintiff further claims in Count Three that her constitutional right to petition has been infringed upon through defendants' intentional failure to update County and Village voter registers, thus violating her First, Fifth, and Fourteenth Amendment rights. (*Id.* ¶¶ 117-31.) In Count Four, plaintiff alleges that her First, Fifth, and Fourteenth Amendment rights have been violated through the "part-time" operation of the Justice Courts. (*Id.* ¶¶ 132-72.) Finally, in Count Five, plaintiff claims that defendants have violated various environmental regulations and the National Housing Preservation Act through the decision to run the court out of the Village Municipal Building. (*Id.* ¶¶ 173-93.) The Court will address each of these contentions in turn.

As an initial matter, before turning to plaintiff's arguments, the Court notes that plaintiff has brought four of her five claims (Counts One through Four) under 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).[3] For claims under § 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). Here, the parties do not dispute that defendants were acting under color of state law. Thus, the question presented in this case for Counts One through Four is whether defendants' conduct deprived plaintiff of the various rights she asserts under the Constitution.

A. Count One

In Count One of her complaint, plaintiff asserts that her constitutional rights have been violated because Local Law #5 allows the Village Justice or Acting Village Justice positions to be "filled now and in the future by non-lawyers who are wholly lacking in sufficient legal training and legal competence to perform all jurisdictional functions of a Village Court as mandated by state law." (Compl. Count I.) Defendants have moved to dismiss this claim on the grounds that: (1) plaintiff lacks standing; (2) the claim is not ripe for adjudication; and (3) the Village law is constitutional.[4]

---

[3] Specifically, Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[4] Defendants argue that the Village Law is constitutional under both Supreme Court and

Although plaintiff has not appeared as a defendant before the Justice Court, plaintiff presents a series of hypotheticals that she argues demonstrate the high likelihood that her constitutional rights will be infringed upon because the Village Justice positions may be filled by non-lawyers. Specifically, plaintiff presents the following hypothetical scenario as support for her claim that the establishment of the Justice Courts infringes upon her constitutional rights. First, plaintiff states that she "occasionally" participates in "the traditional Jewish custom of reciting the blessing over wine in Hebrew at a religious service held at the local Sag Harbor synagogue." (*Id.* ¶ 91a.) After reciting this blessing, plaintiff drinks some of the wine and then drives home from the synagogue. (*Id.*) Next, plaintiff notes that the "parking area for her home is located in full view of, and across from" the Sag Harbor police station, and she "fears being arrested if she admits to drinking." (*Id.* ¶ 91b.) Plaintiff then jumps to the conclusion that because she *may* participate in a religious ceremony that involves drinking wine, she *may* drive home after, and she *might* get pulled over because she lives across the street from a police station, then she "perhaps very soon, or eventually" will be "subjected to a deprivation of her constitutionally protected rights" *if* a non-lawyer Village Justice were to, *inter alia*, suspend her drivers license or incarcerate her. (*Id.* ¶ 91a-f.)

To state plaintiff's argument is to prove that she lacks standing to bring this claim. As the Second Circuit has explained, "Article III of the Constitution limits the judicial power of the United States to the resolution of cases and controversies. This limitation is effectuated through the requirement of standing." *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489 (2d Cir. 2009) (citing U.S. Const. art. III, § 2 and *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471-72 (1982)). "It is axiomatic that '[t]here are three Article III standing requirements: (1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision.'" *Id.* (quoting *Kendall v.*

---

New York Court of Appeals precedent, both of which, defendants argue, allow for lower courts positions to be filled with lay justices so long as a criminal defendant has the ability to opt-out and choose to be tried in front of a law-trained judge. (*See* Defs.' Mem. of Law at 11-13.) In support of this argument, defendants point to New York Criminal Procedure Law Section 170.25, which sets forth the procedures through which a defendant can move to have a case removed from a local court to a superior court. *See generally* N.Y. Crim. Pro. L. § 170.25 (West 2010); *see also North v. Russell*, 427 U.S. 328, 339 (1976) (concluding that a "two-tier trial court system with lay judicial officers in the first tier in smaller cities and an appeal of right with a *de novo* trial before a traditionally law-trained judge in the second does not violate either the due process or equal protection guarantees of the Constitution of the United States"); *People v. Skrynski*, 336 N.E.2d 797, 799 (N.Y. 1977) ("'[T]he Supreme Court has determined that in certain circumstances so long as defendant has the effective alternative of a criminal trial before a court with a traditionally law-trained Judge or Judges, there is no violation of the Federal Constitution. [New York Criminal Procedure Law] provides for a procedure to divest the town and village courts, of, and remove to a superior court, the power to try and determine a criminal case (170.25). Consequently, there is no evident Federal infirmity in the New York State system of town and village courts with lay Justices." (internal citations omitted)). The Court, however, need not reach the merits of this issue because, for the reasons set forth below, the Court finds that plaintiff lacks standing to bring this claim, thus depriving this Court of subject matter jurisdiction over the claims asserted in Count One.

6

*Employees Ret. Plan of Avon Prods.*, 561 F.3d 112, 118 (2d Cir. 2009)); *see also Lamar Adver. of Penn, LLC v. Town of Orchard Park, N.Y.*, 356 F.3d 365, 373 (2d Cir. 2004) ("To meet Article III's constitutional requirements for standing, a plaintiff must allege an actual or threatened injury to himself that is fairly traceable to the allegedly unlawful conduct of the defendant." (internal quotation marks and citations omitted)).

To meet Article III's injury-in-fact requirement, plaintiff's alleged injury "must be 'concrete and particularized' as well as 'actual or imminent, not conjectural or hypothetical.'" *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, (1992) (additional quotation marks omitted)); *see, e.g.*, *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009) (finding that plaintiffs had adequately articulated Article III injury by alleging that they have paid higher tolls as a result of defendant's policy). Furthermore, the alleged injury must "affect[] the plaintiff in a personal and individual way to confirm that the plaintiff has a personal stake in the controversy and avoid having the federal courts serve as merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding." *Baur*, 352 F.3d at 632 (internal quotation marks and citations omitted).

Here, it is abundantly clear that the injury allegedly suffered by plaintiff is merely "conjectural and hypothetical" and does not rise to the level of "concrete and particularized" injury needed to establish Article III standing. Indeed, even plaintiff acknowledges in her complaint that she has not yet been injured and may only suffer an injury "perhaps very soon, or eventually." (Compl. ¶ 91c.) Moreover, not only has plaintiff never appeared as a defendant in the Justice Court—and therefore has never been actually injured by the operation of the Justice Court—but there also is no indication whatsoever that she has *ever* been pulled over for the type of drunk driving offense described in her complaint, much less arrested, convicted, and incarcerated for that offense. Plaintiff's lack of an actual or imminent injury is further underscored by the fact that the current Village Justice is, in fact, an attorney, as noted *supra* in note 2. Thus, plaintiff's claim is based on nothing but rank hypothetical allegations that may or may not ever occur at some undetermined time in the future. Such conclusory allegations fail to establish standing for her to bring this claim.[5]

Moreover, to the extent that plaintiff argues she possesses standing because she,

---

[5] At oral argument, plaintiff attempted to construe her claim as a First Amendment claim, arguing that she might be "chilled" from participating in religious ceremonies involving the drinking of wine for fear that she might subsequently be arrested for drunk driving. The Court finds this argument to be completely without merit. The establishment of the Sag Harbor Village Justice Court in no way infringes upon plaintiff's ability to exercise her First Amendment rights. Indeed, plaintiff is free to participate in any religious ceremonies that she chooses, regardless of whether those ceremonies involve imbibing alcoholic beverages or not. Instead, what New York law prohibits plaintiff from doing is driving after drinking—it goes without saying that plaintiff has no First Amendment right to drive drunk. Thus, to the extent that plaintiff is arguing that she has standing because she is currently chilled from exercising her First Amendment rights, the Court rejects this argument. As outlined *supra*, any other injuries allegedly suffered by plaintiff are purely conjectural, and as such, do not provide her with standing to bring the claims asserted in Count One.

as a lawyer, might represent other individuals appearing before the allegedly unconstitutional Village Courts (*see* Pl.'s Opp. Mem. of Law at 9), this argument must also fail. To establish standing to assert a claim on behalf of a third party, (1) a plaintiff must establish that he "suffered an 'injury in fact,' thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute," (2) the plaintiff "must have a close relation to the third party," and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio,* 499 U.S. 400, 411 (1991) (internal citations and quotations omitted); *accord Fenstermaker v. Obama,* 354 F. App'x 452, 454 (2d Cir. 2009). It is well-established that a lawyer may not "premise third-party standing on relationships with hypothetical future clients." *Fenstermaker*, 354 F. App'x at 455 (attorney could not establish third-party standing where he "alleged only that he might establish an attorney-client relationship with detainees in the future"); *accord Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004) (no third-party standing because "[t]he attorneys before us do not have a 'close relationship' with their alleged 'clients'; indeed, they have no relationship at all"). Accordingly, plaintiff cannot establish third-party standing on the grounds that she may, at some point, represent others in proceedings before the Village Justice Court.

Accordingly, Count One is dismissed on jurisdictional grounds for lack of standing.[6]

---

[6] Because the Court finds that plaintiff undoubtedly lacks standing to bring this claim, the Court need not reach the other grounds asserted by defendants for dismissal of Count One.

B. Count Two

Plaintiff contends that defendants have deprived her of "the right to vote and elect the individual who is to serve in the Village Justice position," insofar as defendants may appoint the first Village Justice, rather than allowing voters to elect an individual to fill the position. (Compl. ¶¶ 110-11.) In support of her claim, plaintiff points to the language of New York Village Law § 3-301(3), which states, in relevant part, that "village justices shall be elective officers." N.Y. Vill. L. § 3-301(3) (West 2010). Plaintiff seeks "temporary, preliminary and permanent injunctive relief . . . prohibit[ing] Defendants from appointing or approving or swearing in any persons to fill the positions of Village Justice and Acting Village Justice until such time as the elective Office of Village Justice is first filled by an individual who is elected by the voters" of Sag Harbor. (Compl. ¶ 114.) She also requests that the Court issue a declaratory judgment that Local Law #5 is unconstitutional on its face and as applied. (*Id.* ¶ 116.)

Defendants argue, however, that this claim is not ripe for adjudication and that, in any event, the appointment of a Village Justice is permissible under New York Public Officers Law Section 30(2), which provides that "[w]hen a new or an additional office shall be created, such office shall[,] for the purposes of an appointment or election, be vacant from the date of its creation, until it shall be filled by election or appointment." N.Y. Pub. Officers L. § 30(2) (West 2010).

As a threshold matter, the Court finds that this claim is ripe for adjudication. For claims to be justiciable under Article III, "courts have long recognized that the controversy, as an initial matter, must be ripe." *Kittay v. Giuliani*, 112 F. Supp. 2d 342, 348 (S.D.N.Y. 2000) (citing *Marchi v.*

*Bd. of Cooperative Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999) and *Thomas v. City of N.Y.*, 143 F.3d 31, 34 (2d Cir. 1998)), *aff'd* 252 F.3d 645 (2d Cir. 2001). The Supreme Court has explained that "[r]ipeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (internal quotation marks and citation omitted). Notably, even if a case presents an actual case or controversy, and is thus "constitutionally ripe," it may not be "prudentially ripe" for review. *See Simmonds v. Immigration & Naturalization Serv.*, 326 F.3d 351, 357 (2d Cir. 2003). In deciding whether a case is prudentially ripe for review, courts must consider: "(1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld." *Id.*

Moreover, in a declaratory judgment action, "[t]he standard for ripeness . . . is that 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). In other words, an "actual controversy," as referenced in the Declaratory Judgment Act, is defined as one that is "real and substantial . . . admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir. 1993) (internal citation and quotation marks omitted); *see also Georgia-Pacific Consumer Prods., LP v. Int'l Paper Co.*, 566 F. Supp. 2d 246, 255 (S.D.N.Y. 2008) (stating that "relief should only be granted where it can be 'of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts'" (quoting *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001)); *U.S. Underwriters Ins. Co. v. Kum Gang, Inc.*, 443 F. Supp. 2d 348, 352 (E.D.N.Y. 2006) ("A court cannot adjudicate conjectural or hypothetical cases or controversies. A controversy cannot be a mere possibility or probability that a person may be adversely affected in the future." (internal citations omitted)). "Whether a real and immediate controversy exists in a particular case is a matter of degree and must be determined on a case-by-case basis." *Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991). "Several courts have acknowledged the difficulty of line-drawing between those cases in which a controversy is of a hypothetical or speculative nature, and those that present issues of 'sufficient immediacy and reality' to warrant declaratory relief." *M.V.B. Collision, Inc. v. Allstate Ins. Co.*, No. 07 Civ. 0187 (JFB) (JO), 2007 WL 2288046, at *7 (E.D.N.Y. Aug. 8, 2007) (quoting *Duane Reade, Inc.*, 411 F.3d at 388); *see also Reichhold Chems., Inc. v. Travelers Ins. Co.*, 544 F. Supp. 645, 650 (E.D. Mich. 1982) ("The difference between an abstract question and a controversy contemplated by the Declaratory Judgment Act is necessarily one of degree and, as such, it is extremely difficult to fashion a precise test for determining the existence, or non-existence, of an actual controversy in every fact situation.").

In this case, as noted *supra* in note 2, the Village of Sag Harbor has appointed a Village Justice to serve until the election scheduled for June 2011. Accordingly, if the Court were to reach the merits of plaintiff's claim, the Court would be adjudicating an "actual controversy" based upon an act that has already occurred, namely, the appointment of a Village Justice. Thus, this claim is ripe for adjudication.

However, even assuming *arguendo* that plaintiff is correct that the appointment of a Village Justice violates New York State law, the Court nevertheless finds that plaintiff has not alleged a federal constitutional violation for which relief can be granted under § 1983. Plaintiff's claims are based solely upon defendants' purported violation of New York State Village Law Section 3-301(3), which provides that village justices are elected, rather than appointed, officials. Plaintiff argues that "[n]othing stated in [the] New York Village Law authorizes the appointment of both the Village Justice and Acting Justice at the same time in order to start the Sag Harbor Village Justice Court." (Compl. ¶ 103; *see also id.* ¶ 107-08 ("From the plain language of the New York Village Law it is clear that the office of Village Justice is an elected position and it is not an appointed position. . . . Defendants, however, . . . have now openly threatened to eschew that New York statutory process. . . ."); *id.* ¶ 112 ("Because New York Village Law does not authorize the mayor to make two simultaneous appointments for the Village Justice and the Village Acting Justice, Defendants should be enjoined from appointing any Village Justice . . . .").) Even if plaintiff is correct in her interpretation of the applicable provisions of New York's Village Law, "[i]t is axiomatic that violations of state law alone are insufficient to state a claim for section 1983 relief." *Powers v. Coe*, 728 F.2d 97, 105 (2d Cir. 1984) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). The mere fact that a case may involve voting rights or political elections does not change this analysis. *See Kasper v. Bd. of Elections Comm'rs of the City of Chicago*, 814 F.2d 332, 342 (7th Cir. 1987) ("The district court has no supervisory powers and no authority to instruct the Board [of Elections] how to follow state law. A violation of state law does not state a claim under § 1983. . . . That this case involves elections does not matter. [The Supreme Court has held] that a deliberate violation of state election laws by state election officials does not transgress against the Constitution." (internal citations omitted)). Plaintiff has alleged no facts to set forth a plausible claim for violation of her due process or equal protection rights, or any other constitutional rights for that matter. Instead, each of plaintiff's allegations in Count Two relate to defendants' alleged violation of state law, and the mere labeling of plaintiff's claims as arising under the Constitution does not transform them into legitimate constitutional claims for purposes of § 1983.

Significantly, plaintiff is not challenging the constitutionality of the state's law regarding the election of Village Justices. To the contrary, she is seeking to ensure that defendants comply with the terms of that law as it is written. As explained by the Court of Appeals for the District of Columbia,

> It is one thing for the federal Constitution to guarantee a right of access to a state electoral process that has been restricted by state law. It is quite another to assert that the federal Constitution guarantees that state officials will act in conformity with state law. In the former case, no relief is available under state law; in the latter, complete relief is

available. In the former, an official policy of the state is challenged—in the latter no official policy of the state is challenged; rather, the state's policy is sought to be vindicated. Vindication of state policy ought, as an initial matter, to take place in state courts. Perhaps for these or similar reasons, no case cited to us or of which we are aware has ever held that the constitutional right to vote in state elections extends so far as to include a right to control the behavior of state officials under state law. To the contrary, the Supreme Court has held that an elected official's threatened violation of a state law does not automatically raise a federal claim.

*Grano v. Barry*, 733 F.2d 164, 168-69 (D.C. Cir. 1984). This Court agrees with the reasoning of the D.C. Circuit and, accordingly, finds that plaintiff has failed to state a claim for which federal relief can be granted on Count Two.

### C. Count Three

New York Village Law Section 3-301(2)(a) provides, in pertinent part, that the board of trustees of a village may establish the office of village justice "by resolution or local law, subject to a permissive referendum." To place such a referendum on the ballot for approval by a village's voters, a petition requesting a referendum must be signed and acknowledged by 20% "of such electors in the village, as shown on the register of electors for the previous general village election." N.Y. Vill. L. § 9-902(1) (West 2010). Plaintiff argues that defendants have "deliberately and intentionally engaged in certain conduct to diminish the success of any petition" by failing to maintain accurate voter registers. (Compl. ¶ 124.) In particular, according to the complaint, the Village "has deliberately relied upon an artificially inflated amount of purported 'eligible voters,'" thus "depriv[ing] Plaintiff and others from gathering a sufficient amount of names of eligible voters in order to meet the criteria of '20% of the number of names on the register of electors.'" (*Id.* ¶ 126.)

As with Count One, the Court finds that plaintiff lacks standing to bring this claim. Specifically, plaintiff has not suffered any injury as a result of the allegedly inaccurate voter registers because she does not allege that she made any attempt to collect a sufficient number of signatures to petition for a referendum on the Justice Courts. "As a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy." *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997). In response, plaintiff argues in a conclusory fashion that "any such attempt [to petition] is futile and the law does not require futile acts." (Pl.'s Opp. Mem. of Law at 24.) Although it is true that a plaintiff's failure to submit to a challenged policy may be excused for standing purposes where a plaintiff makes a "substantial showing" that submission to the policy would have been futile, *Jackson-Bey*, 115 F.3d at 1096, Weiss has made no such substantial showing here. Indeed, plaintiff has set forth no specific factual allegations to support her futility argument, and instead has relied solely upon generalized assertions that the voter lists are outdated, a fact which, in and of itself, does not prove that any efforts to petition for a referendum would inevitably have failed. Accordingly, plaintiff lacks standing to bring this claim.

In any event, even if plaintiff had standing, the Court would still dismiss this Count because plaintiff has failed to state a claim for which relief can be granted. As a

threshold matter, "the right to pass legislation through a referendum is a state-created right not guaranteed by the U.S. Constitution." *Molinari v. Bloomberg*, 564 F.3d 587, 597 (2d Cir. 2009). However, should a state choose to confer such a right on its citizens, "it is 'obligated to do so in a manner consistent with the Constitution.'" *Id.* (quoting *Meyer v. Grant*, 486 U.S. 414, 420 (1988)). Thus, the Supreme Court has overturned state laws that placed unconstitutional regulations on speech in the intitiative context by, for example, "dictat[ing] *who* could speak (only volunteer circulators and registered voters) or *how* to go about speaking (with name badges and subsequent reports)." *Id.* at 599 (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (*en banc*) and citing *Meyer* and *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999)). Nonetheless, "*Meyer* and *Buckley* do not guarantee a right to legislate by referendum," but instead merely "make clear that the First Amendment protects political speech from undue government interference in the context of referendum petitioning." *Id.* In other words,

> Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise. . . . The distinction is between laws that regulate or restrict the communicative conduct of persons advocating a position in a referendum, which warrant strict scrutiny, and laws that determine the process by which legislation is enacted, which do not.

*Initiative & Referendum Inst.*, 450 F.3d at 1099-1100; *see also Biddulph v. Mortham*, 89 F.3d 1491, 1498 n.7 (11th Cir. 1996) ("[T]he Court [in *Meyer*] established an explicit distinction between a state's power to regulate the initiative process in general and the power to regulate the exchange of ideas about political changes sought through the process. The Court only addressed the constitutionality of the latter.").

Here, plaintiff is not in any way restricted from engaging in political discourse or other First Amendment activity regarding the creation of the Village Justice Courts. Indeed, plaintiff remains free to advocate her position against the Justice Courts or to file a petition—she merely argues that the likely success of any petition has been "diminish[ed]" by defendants' actions. (Compl. ¶ 124.) However, even if a law or policy "will make it more difficult for plaintiffs to organize voter initiatives and referenda in the future, 'the difficulty of the process alone is insufficient to implicate the First Amendment, as long as the communication of ideas associated with the [referendum process] is not affected.'" *Molinari*, 564 F.3d at 602 (quoting *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997)); *see also Wellwood v. Johnson*, 172 F.3d 1007, 1009 (8th Cir. 1999) (upholding Arkansas law requiring signatures of 38% of the registered voters in a political subdivision to put an initiative on the ballot in local-option elections where the statute "in no way burden[ed] the ability of supporters of local-option elections to make their views heard"); *Dobrovolny*, 126 F.3d at 1112-13 (state constitutional provision requiring initiative petitions to include signatures of 10% of the voters registered on the day the petition was to be submitted did not violate First Amendment where, even though the provision made it impossible for the petitioners to know how many signatures were needed, thus making it more difficult to get issues on the ballot, the requirement nevertheless did not infringe upon the "ability to circulate petitions or otherwise engage in political speech"); *Taxpayers*

*United for Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993) (law requiring petitioners to obtain signatures from registered voters totaling 8% of the total vote cast in the last gubernatorial election did not violate First Amendment where "[u]nlike the challenged provisions in *Meyer*, Michigan's initiative system does not restrict the means that the plaintiffs can use to advocate their proposal. . . . The Michigan procedure does nothing more than impose nondiscriminatory, content-neutral restrictions on the plaintiffs' ability to use the initiative procedure that serve Michigan's interest in maintaining the integrity of its initiative process. Our result would have been different if, as in *Meyer*, the plaintiffs were challenging a restriction on their ability to communicate with other voters about proposed legislature, or if they alleged they were being treated differently than other groups seeking to initiate legislation."); *Kelly v. Macon-Bibb Cnty. Bd. of Elections*, 608 F. Supp. 1036, 1037, 1038-39 (M.D. Ga. 1985) ("[Georgia state] law provides that any municipality or county by local referendum may remove itself from the requirement of [water] fluoridation. In order to call such a referendum, the statute requires a petition of 10 percent of the registered voters in such political subdivision who voted in the last general election. . . . Plaintiffs, however, have not been prohibited from exercising a fundamental constitutional right. This is *not* a 'right to vote' case; referendums, unlike general elections for a representative form of government, are not constitutionally compelled. . . . By allowing an 'opt out' procedure by way of local referendums, the state did not create a fundamental right protected by the federal Constitution. In establishing eligibility requirements for those voters authorized to call a local referendum by way of petition, the state may not discriminate on the basis of 'suspect' classifications such as race. However, the classifications established by defendants' construction of [the state law] do not involve such suspect classifications." (internal citations omitted)). Accordingly, plaintiff, who has not cited a single case to support her argument, has failed to state a claim for the violation of her constitutional right to petition.[7]

Furthermore, to the extent plaintiff is merely seeking to compel state officials to comply with the requirements of state laws regarding petitions and referenda,[8] this claim

---

[7] Plaintiff also alleged in an extremely conclusory fashion that her Fifth Amendment rights, as well as her due process and equal protection rights, were violated in connection with the allegations in Count Three. However, plaintiff has asserted no facts whatsoever to support such constitutional claims. Indeed, as far as plaintiff's due process rights are concerned, it is clear that plaintiff has state procedures available to her, such as an Article 78 petition, to ensure defendants' compliance with state law. Accordingly, the Court finds that plaintiff has also failed to state a claim for relief under either the Fifth or the Fourteenth Amendments.

[8] The Court notes that defendants contend that they were in compliance with state law regarding which voters to keep on the registers. (*See* Defs.' Reply at 14-15 ("The [New York Appellate Division] held that when counting the village electors for the purposes of a § 9-902(1) petition, residents who were either registered voters in the village but were not included on the county voting rolls; or whose names were removed from county lists pursuant to Election Law Article 5 (Title IV) should *not* be excluded from the total number of electors. . . . Village Law also does not limit qualified electors to those who appeared on the last preceding village real property assessment roll or, stated more simply, property owners. Rather, all residents who are 'qualified electors[,]' whether their names appear on that roll or not, must be considered in determining the number upon

must fail for the same reason as Count Two. As explained *supra*, "[v]indication of state policy ought . . . to take place in state courts. . . . [A]n elected official's threatened violation of a state law does not automatically raise a federal claim." *Grano*, 733 F.2d at 169.[9]

### D. Count Four

Plaintiff argues that "[d]efendants' stated customs and policies and practices which they have established for the Sag Harbor Village Justice Court and the Village Justice Office have diminished, compromised, frustrated and thwarted the Village Justices' abilities to perform his or her judicial functions in a professional and ethical manner, thus unconstitutionally subjecting Plaintiff and others to an unconstitutional judicial process and 'part time justice.'" (Compl. ¶ 140.) In support of this argument, plaintiff points to, *inter alia*, a lack of space for the Village Justice to have private chambers (*id.* ¶ 141), for a secretary or law clerk to sit (*id.* ¶ 143), or for defense attorneys to meet with their clients (*id.* ¶ 144); a lack of funds allocated for interpreters (*id.* ¶ 150-52); the absence of a law library or contract plans with Westlaw or LEXIS (*id.* ¶ 155); and the lack of a budget for metal detector security machines (*id.* ¶ 164-65).

It is abundantly clear that plaintiff lacks standing to bring this claim. As with Count One, the allegations in this Count are based purely on conjecture and conclusory allegations with no factual foundation. Even if plaintiff were arrested and tried before a Village Justice—which she has not been—it is difficult to see how plaintiff could be injured by the purported flaws that she points out in her complaint. For example, the lack of foreign language interpreters would have no impact on plaintiff, who is representing herself in this litigation and clearly is fluent in English.[10] Likewise, it is hard to imagine any scenario in which the absence of a private chambers for the Village Justice or the lack of office space for a secretary would have any impact whatsoever on plaintiff's constitutional rights. Furthermore, as an additional

---

which the 20% requirement of the Village Law must be computed." (citing *In re Jacaruso*, 407 N.Y.S.2d 230, 230-31 (App. Div. 1978) and *In re Neuendorffer*, 9 N.Y.S.2d 950, 951 (App. Div. 1939)). The Court need not reach the merits of plaintiff's claim, however, because as explained *supra*, plaintiff lacks standing to bring this claim and, in any event, has failed to state a claim for which federal relief can be granted.

[9] In her opposition papers, in a one-sentence reference, plaintiff also appears to rely upon the requirements of the Help Americans Vote Act ("HAVA") in relation to Count Three. However, plaintiff's complaint makes no reference to HAVA or to any claims arising thereunder. To the extent that plaintiff is seeking to amend her pleadings to raise a claim under HAVA, she is not permitted to do so through arguments made solely in her motion papers. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (finding plaintiff did not state a cause of action where necessary element of claim was not alleged in complaint and was only mentioned for the first time in her opposition memorandum to the motion to dismiss). Nor has plaintiff in any way explained how the requirements of HAVA are relevant to her cause of action. Accordingly, to the extent that plaintiff asserts in a conclusory fashion a violation of HAVA, plaintiff has failed to state a plausible claim.

[10] To the extent that plaintiff's argument is based upon her possible future legal representation of non-English speaking clients, her claim must also fail for the reasons discussed *supra*. *See Fenstermaker*, 354 F. App'x at 455 (attorney could not establish third-party standing where he "alleged only that he might establish an attorney-client relationship with detainees in the future").

example, one of plaintiff's concerns is that the Village Justice Court will not be prepared to conduct arraignments and hearings within twenty-four hours of a defendant's arrest. (*Id.* ¶ 149.) This concern, however, is based upon nothing but hypothetical speculation—given that plaintiff has never even appeared before the Justice Courts, the Court finds it impossible to evaluate whether the Justice Courts would be able to arraign her within twenty-four hours of her arrest.

Accordingly, Count Four of plaintiff's complaint is dismissed on jurisdictional grounds for lack of standing.

### E. Count Five

As an initial matter, the Court notes that it is not entirely clear what claims plaintiff is attempting to assert in this count. She appears to have grouped together several different arguments related to the housing of the Village Justice Court in the Sag Harbor Municipal Building, including claims under the National Housing Preservation Act ("NHPA"), the National Environmental Protection Act ("NEPA"), and the New York State Environmental Quality Review Act ("SEQRA"). Defendants have moved to dismiss this count on the grounds that plaintiff's claims are not ripe for adjudication and that, in any event, defendants have complied with the relevant environmental regulations.

Turning first to defendants' ripeness argument, plaintiff was unable to articulate at oral argument why certain of her claims in Count Five were ripe for adjudication. For example, plaintiff devotes several paragraphs of her complaint to concerns that using the Municipal Building for the Village Court's operations may result in excessive toilet flushing that could lead to the flooding of untreated sewage into the neighborhood around the Municipal Building. (Compl. ¶¶ 184-87.) As with many of plaintiff's other arguments, these concerns are based upon nothing but pure speculation, and none of the potential injuries highlighted by plaintiff have yet occurred. Accordingly, the Court finds that any claims related to toilet overflow and harm to the surrounding community are not ripe for adjudication.

To the extent that plaintiff is arguing that defendants have failed to follow the proper environmental review procedures before beginning operations of the Justice Courts in the Municipal Building, the Court finds that plaintiff has failed to state a claim for which federal relief can be granted. First, any claims under the NHPA must fail because plaintiff has not alleged the involvement of any federal agencies in the decision to move the Justice Court into the Municipal Building. It is well-settled in the Second Circuit that "violations of the NHPA can only be committed by a federal agency." *W. Mohegan Tribe & Nation of N.Y. v. New York*, 246 F.3d 230, 232 (2d Cir. 2001) (affirming dismissal of NHPA claim brought against the State of New York) (citing 16 U.S.C. § 470f (2000) and *Vieux Carre Prop. Owners v. Brown*, 875 F.2d 453, 458 (5th Cir. 1989) ("By its terms, only a federal agency can violate section 470f.")); *cf. Moody Hill Farms Ltd. P'ship v. United States Dep't of the Interior, Nat'l Park Service*, 205 F.3d 554, 562 (2d Cir. 1999) ("[N]ational listing on its own does not impose any burdens on plaintiffs' use of their property. National listing constrains only the ability of departments of the federal government to take action affecting a listed property without first considering the effect of that action on the property."); *cf. W. Hartford Initiative to Save Historic Prop. v. Town of W. Hartford*, No. 06-cv-739 (RNC), 2006 WL 2401441, at *6 (D. Conn. Aug. 18, 2006) ("Because the NHPA does not apply to construction projects affecting historic

properties in the absence of federal involvement, preservationists must rely on state and local laws to protect properties from unreasonable destruction."). Here, based on the allegations in the complaint, it is undisputed that the decision to create and open the Justice Court was made solely by local policymakers within the Village of Sag Harbor, without any input, involvement, or approval from federal agencies. Accordingly, any claims brought under the NHPA must be dismissed.

Similarly, plaintiff's claims under the NEPA must also be dismissed due to lack of federal involvement. Like the NHPA, the NEPA applies only to federal agencies undertaking "major federal action." *So. Bronx Coal. for Clean Air, Inc. v. Conroy*, 20 F. Supp. 2d 565, 570 (S.D.N.Y. 1998) ("'Congress did not intend NEPA to apply to state, local, or private actions, hence, the statute speaks only to 'federal agencies' and requires impact statements only as to 'major federal actions.'" (quoting *Atlanta Coal. on the Transp. Crisis v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1344 (5th Cir. 1979)); *accord Bus. & Residents Alliance of E. Harlem v. Martinez*, No. 03-cv-5363 (JFK), 2004 WL 1335903, at *4 (S.D.N.Y. June 14, 2004) (discussing *South Bronx Coalition* and noting "[i]f the federal government lacks discretion over substantial portions of a project, especially where state and local agencies have exclusive control of the content and implementation of the plan, the project is not 'federal' and failure to adhere to the requirements of the NEPA will not be grounds for enjoining the project"). Thus, given the complete lack of any allegation of federal agency involvement in any aspect of the decision to create the Village Justice Court and house it in the Municipal Building, plaintiff has failed to state a claim for relief under the NEPA.[11]

Furthermore, plaintiff also argues that defendants did not conduct a proper environmental review before deciding to operate the Justice Court out of the Municipal Building and, thus, violated the requirements of SEQRA. This claim, however, is a purely state-law claim and, as such, the Court declines in its discretion to exercise supplemental jurisdiction over it, given the absence of any federal claims that survive a motion to dismiss. *See Gebman v. New York*, No. 07-cv-1226 (GLS-DRH), 2008 WL 2433693, at *3 (N.D.N.Y. June 12, 2008) ("Although it is not clear whether [plaintiff] intended to bring his SEQRA claim under Article 78 of the New York Civil Practice Law and Rules ("CPLR"), it is clear that he should have. Therefore, the

---

[11] Furthermore, although this issue has not yet been addressed by the Second Circuit, other circuit courts have held that there is no private right of action under either the NEPA or the NHPA. *See, e.g.*, *Karst Envtl. Educ. & Prot., Inc. v. Envtl. Prot. Agency*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) ("[B]ecause NEPA creates no private right of action, challenges to agency compliance with the statute must be brought pursuant to the Administrative Procedure Act. . . . [A]nd because NHPA, like NEPA, contains no private right of action, we agree with the Ninth Circuit that NHPA actions must also be brought pursuant to the APA." (citing *San Carlos Apache Tribe v. United States*, 417 F.3d 1091 (9th Cir. 2005))); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006) ("'Because NEPA does not provide for a private right of action, plaintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act.'" (quoting *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005)). However, the Court need not reach this issue because the lack of federal involvement provides sufficient grounds to dismiss plaintiff's claims under the NEPA and the NHPA.

court construes the SEQRA claim as having been brought pursuant to Article 78. As such, it is not properly before this court. . . . Accordingly, the court declines to exercise supplemental jurisdiction over [plaintiff's] SEQRA claim, and such claim is therefore dismissed." (internal citations omitted)); *Brooklyn Bridge Park Coal. v. Port Auth. of N.Y. & N.J.*, 951 F. Supp. 383, 395 (E.D.N.Y. 1997) ("Having dismissed all of plaintiff's federal claims, this court no longer has any independent jurisdiction over state law claims against [defendant] for non-compliance with New York's . . . State Environmental Quality Review Act. . . . These claims, and the motions to dismiss them, involve issues of state public policy that, in the absence of federal jurisdiction, are best resolved by the state courts. The state claims are, therefore, dismissed without prejudice to refile in state court."). Accordingly, the Court dismisses plaintiff's SEQRA claims without prejudice to re-filing in state court.

F. Leave to Re-Plead

In a one-sentence reference, at the end of her opposition papers, plaintiff requests leave to amend or re-plead the claims in her Complaint in the event the Court finds any deficiencies. Under Rule 15(a) of the Federal Rules of Civil Procedure, "leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, even under this liberal standard, it appears that any attempt to re-plead in this case would be futile based upon the Court's review of the Complaint and plaintiff's opposition papers. As discussed in detail *supra,* it is clear from the complaint (as well as plaintiff's submissions in opposition to the motion) that plaintiff lacks standing to assert a number of her federal claims. The Court is unaware of, nor has plaintiff identified, any additional allegations that plaintiff could add to her complaint to establish standing. Moreover, the remaining claims are purely state-law claims for which no plausible Section 1983 or other federal claim can exist given the allegations in this case, and thus such defects would not be cured by re-pleading. However, in an abundance of caution, the Court will give plaintiff an opportunity to be heard on the issue of leave to re-plead so that, before the Court decides whether leave to re-plead is warranted, plaintiff can explain what additional allegations she would be seeking to add to overcome these defects and why such additional allegations would not be futile. Thus, the Court will conduct a conference to address plaintiff's request to re-plead.

IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss the complaint in its entirety as it relates to plaintiff's federal claims. Moreover, to the extent that plaintiff's complaint seeks to assert state-law claims, the Court declines in its discretion to exercise supplemental jurisdiction over such claims, given that none of the federal claims survive a motion to dismiss. Thus, the Court also dismisses plaintiff's state-law claims (without prejudice to re-filing such claims in state court).

SO ORDERED.

_____
Judge Joseph F. Bianco
United States District Judge

Date: January 24, 2011
Central Islip, NY